**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| KIM RIDLEY, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. H-09-1867 |
| § | |
| HARRIS COUNTY and HARRIS § | |
| COUNTY COMMUNITY SUPERVISION § | |
| AND CORRECTIONS DEPARTMENT, § | |
| § | |
| Defendants. § | |

**MEMORANDUM AND ORDER**

This is a Title VII case. Kim Ridley sued her former employer, the Harris County Community Supervision & Corrections Department (HCCSCD),[1] alleging retaliation under Title VII, 42 U.S.C. § 2000e-3(a). She claims that she was denied a promotion in retaliation for a series of complaints. The initial complaint was about a subordinate she overheard referring to a client as a "fucking black probationer ass bitch" and referring to Ridley herself as a "fucking black bitch female for a supervisor." Ridley then complained about the inadequate disciplinary response. Finally, she complained about how she was treated after she requested, and received, a transfer away from that subordinate.

HCCSCD moved for summary judgment. (Docket Entry No. 27). Ridley responded, (Docket Entry No. 31), and HCCSCD replied and filed numerous objections to the affidavits Ridley submitted, (Docket Entry No. 34). Ridley did not respond to the objections. Ridley did clarify that she is asserting only a retaliation claim based on the failure to grant her the promotion and that she

---

[1] Ridley originally sued Harris County as well, but voluntarily dismissed her claim against it. (Docket Entry No. 6).

is not seeking punitive damages.

Based on the record; the motion, response, and reply; and the relevant law, this court grants in part and denies in part HCCSCD's motion for summary judgment. The retaliation claim remains. The reasons are explained below.

**I.     Background**

The background is drawn from the summary judgment record.[2] Ridley began working for HCCSCD, the agency responsible for supervising nearly 40,000 parolees in Harris County, Texas, in March 1993. She resigned in July 2010, a little more than 17 years later. Ridley began work as one of approximately 300 to 400 Community Supervision Officers. On March 3, 2007, Ridley received a promotion to Assistant Supervisor in the Court Services Section. Donna Battenfield was her supervisor. Ridley initially supervised four employees, but after September 6, 2007, her staff was reduced to two. One of those direct reports was Cheri Schultz.

On October 28, 2007, Ridley picked up her phone and overheard a conversation between Schultz and another HCCSCD employee, Mary Menchaca. Ridley overheard Schultz call a probationer a "fucking black probationer ass bitch" and refer to Ridley as a "fucking black bitch female for a supervisor." Ridley reported the conversation to her own supervisor, Battenfield, who forwarded the complaint to HCCSCD's Human Resources Department. Ridley was not involved in the disciplinary process that followed. On November 2, 2007, Schultz received a Level II

---

[2] The summary judgment record includes Ridley's deposition, (Docket Entry No. 27, Ex. 1); Ray Garcia's deposition, (*id.*, Ex. 2); Susan Orendac's deposition, (*id.*, Ex. 3); Ridley's EEOC file, (*id.*, Ex. 4); Ridley's responses to interrogatories, (*id.*, Ex. 5); Ridley's declaration, (Docket Entry No. 31, Ex. 1); a November 2, 2007 counseling report, (*id.*, Ex. 2); Carolyn Kizzee's declaration, (*id.*, Ex. 3); documents relating to Ridley's promotion interview, (*id.*, Ex. 4, 5); HCCSCD's policy manual, (*id.*, Ex. 6); Ridley's April 17, 2008 grievance after not receiving the promotion, (*id.*, Ex. 7); Kizzee's May 1, 2008 response to the grievance, (*id.*, Ex. 8); Ridley's EEOC charge of discrimination, (*id.*, Ex. 9); a March 17, 2008 letter from HCCSCD Human Resources Director Elaine Hilton informing Ridley that she would not be interviewed for the promotion, (*id.*, Ex. 10); an April 3, 2008 letter from Hilton informing Ridley that she did not receive the promotion, (*id.*, Ex. 11).

Corrective Counseling Report, which became part of her personnel file. Although Ridley was initially pleased with the disciplinary action, she came to believe that Schultz's punishment was insufficient. Ridley was also displeased that although HCCSCD had transferred the responsibility for supervising Schultz away from Ridley, Schultz's office remained two doors away and HCCSCD took away the phone that had allowed Ridley to pick up other lines.

Ridley requested a transfer to a different HCCSCD division. Ray Garcia and Kim Valentine met with Ridley in November 2007 about her request. They recommended that Ridley take a temporary assignment to allow her to work away from Schultz. Ridley took a temporary clerical position working under Susan Ordenac beginning just before Thanksgiving 2007.

Ridley worked for Ordenac for six weeks. Ridley's duties included reviewing HCCSCD's training procedures and preparing a list of Adult Basic Education and General Equivalency Diploma classes. (Docket Entry No. 27, Ex. 3 at 49–50). Ridley testified that she felt her position under Ordenac did not take advantage of her skills. Ridley felt that the assignment was in retaliation for the complaints she had made about Schultz and about the disciplinary response. Orendac claims that Ridley had performance problems while working under her supervision. According to Orendac, Ridley did not complete most of her assignments. (*Id.* at 46). Orendac testified that Ridley worked unpredictable hours, had problems with timekeeping, and violated Department policy by using an HCCSCD car to buy a birthday present for a coworker and by interacting with the media. (Docket Entry No. 27, Ex. 3 at 59–77, 86–88).

HCCSCD places the most emphasis on the media interaction, which it calls a "serious violation of policy." (Docket Entry No. 27 at 7). The incident arose from media coverage of Quanell X, a local activist, speaking on the steps of the HCCSCD's offices. He was accompanied

3

by the family of the victim of a recent crime committed by a probationer. Orendac testified that Ridley spoke either to Quanell X or to one of the family members to learn the probationer's identity and then returned to the office and looked up the probationer's file. Orendac testified that Ridley should have reported the press conference to HCCSCD administration and taken no further action. The next day, Orendac asserts, she met with Ridley to tell her that her actions had been inappropriate. (Docket Entry No. 27, Ex. 3 at 61–64).

Ridley disputes both what Orendac accused her of doing and what Orendac told her the following day. Ridley asserts that she "did not speak to the media, Quanell X, or any family members during this press conference. I did stand around long enough to find out the case for which the press conference was being held. I then immediately went back inside the building to report that we had a media issue." (Docket Entry No. 31, Ex. 1, ¶ 32). Ridley explained that she looked up the probationer's case information because she had written the "policy regarding how the HCCSCD was to handle warrants and arrests and wanted to inform [her] former department head about this occurrence." (*Id.*, ¶ 33). Ridley claims that Orendac followed her into her office and said that she "could not believe that the Assistant Supervisor, Melinda Biersdorfer, along with the [employee] responsible for that case improperly spoke to the family against our policy." (*Id.*, ¶ 34). Ridley asserts that "Orendac never mentioned that she thought I acted inappropriately." (*Id.*). According to Ridley, Orendac never asked with whom she spoke, how she found out the case name, or why she checked into the case. (*Id.*, ¶ 35). Ridley also denies that Orendac ever criticized her for using the HCCSCD car to purchase the birthday present. (*Id.*, ¶ 38).

Ridley had complained to Orendac about the Schultz incident and her own dissatisfaction over the disciplinary response. Ridley told Orendac that she felt the work she was receiving in the

temporary assignment was beneath her skill and experience and was in retaliation for her complaints about Schultz and the discipline that resulted. Ridley testified that Orendac told her to drop her complaints so that she would not be viewed as "inflexible" and "having an inability to deal with adversity and conflict." (*Id.*, ¶ 28, 29). Ridley believed that "Orendac was specifically threatening me that if I did not drop my complaint about Ms. Schultz, I would have a hard time getting promoted in the future." (*Id.*, ¶ 30). Ridley asserts that Orendac was "well aware" that she "sought to move up in the Department." (*Id.*, ¶ 30).

In response to a deposition question asking whether she told Ridley that said pressing a retaliation claim would be perceived as "inflexible," Orendac responded:

> I don't believe that was the exact dialogue that we had. I believe that when we had discussion I put it to her in the context of that as we present ourself, we are always looked at whether it's positively or negatively and that her given response to a situation will go forward with her and I don't have — I mean, I don't have any power.
> So it wasn't that I could say you're not going to — it was again a coaching — a coaching sentence to surface to Kim as her manager and as somebody who's really trying to help her. We all have our given responses. And how we act in those responses then carries us forward. I knew she would like to have gotten promoted. I knew that she's ambitious and she's bright. So my hope was that she can go forward in a way that she can really put that — tuck it away and while it still may be bothersome, tick it away and just build and go forward. So that was the crux of the conversation to surface that — I don't have — I have no power. I mean, I have no power at all. Nor would I in any way tell somebody that if you do this, you're never going to get promoted. I'm not — I would never do that because . . . because I was trying to empower Kim, not squash her. And she never gave me the impression that she felt like I was talking to her in a way that was implying that either. Ever.

(Docket Entry No. 31, Ex. 3 at 119–20).

Ridley complained to Ray Garcia that she believed Orendac's comments violated

5

HCCSCD's antiretaliation policy. (Docket Entry No. 31, Ex. 1, ¶ 36). After Ridley complained about Orendac, Garcia assigned Ridley to a new position under Carolyn Kizzee, with the same salary and benefits. On February 15, 2008, HCCSCD employees learned that the Department planned to make cutbacks after a reduction in state funding. Ridley kept her salary and benefits, but her title changed to Senior Officer and she had to take on probation casework. (Docket Entry No. 27, Ex. 4 at 314). The cutbacks resulted in 13 open supervisor positions from a pool of 33 eligible assistant supervisors. Ridley, along with 31 others, applied. Ridley was among the most senior applicants.

The HCCSCD promotion process involved several phases. In the first phase, all applications received scores. Ridley's score was below average, but two candidates who ultimately received a promotion had lower scores in this first phase. (Docket Entry No. 31, Ex. 3, ¶ ). In the second phase, Rhonda Pangarakis interviewed each applicant's last three supervisors. Ridley's last three supervisors were Kizzee, Orendac, and Battenfield. Ridley's score from these interviews was the lowest of the applicant pool.

In phase three, six HCCSCD employees interviewed the candidates. The committee included Ridley's then-supervisor, Kizzee, who did not interview Ridley. Kizzee testified that the panel spent "the bulk" of its time discussing three or four candidates, including Ridley. (Docket Entry No. 31, Ex. 3, ¶ 20). She asserted that "[w]hile we all thought her written response were excellent and we were impressed by her passion, her attention to detail and her job understanding, the other panel members were very concerned over her apparent inability to deal with conflict, her apparent lack of judgment and her lack of discretion in dealing with outside sources." (*Id.*, ¶ 20). Kizzee testified that she believed the panel had "relied heavily on [Orendac's] view that [Ridley] did not complete her assignments and that she demonstrated a marked lack of judgment regarding what became

labeled as 'the media incident.'" (*Id.*, ¶ 19). According to Kizzee, the panel discussed Ridley's encounter with Schultz and whether Ridley "handled that situation appropriately." (*Id.*, ¶ 22). Kizzee testified that it was "common knowledge within the department that [Ridley] was a considered a problem" because of her dispute with Schultz and her subsequent disagreement with the way Schultz was disciplined. (*Id.*, ¶ 4).

Ridley did not receive the promotion. She filed a grievance on April 17, 2008, alleging that the failure to promote her was in retaliation for her complaint about Schultz and the events that occurred afterwards. (Docket Entry No. 27, Ex. 4 at 678–80). The grievance was denied. (*Id.* at 700–03). Ridley did not appeal. She filed a charge of discrimination with the EEOC on August 18, alleging racial discrimination and retaliation. (Docket Entry No. 32, Ex. 9). The EEOC issued a right-to-sue letter on March 16, 2009. (Docket Entry No. 1, ¶ 10).

Ridley sued on June 15, 2009, asserting racial discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981. (Docket Entry No. 1). Ridley quit her job with HCCSCD in July 2010.

HCCSCD moved for summary judgment. In response, Ridley clarified that she is pursuing only her retaliation claim based on the decision not to promote her, and that she is not seeking punitive damages. (Docket Entry No. 31 at 20). HCCSCD has challenged only the causation element for the retaliatory failure-to-promote claim. Ridley responds that sufficient evidence of causation exists to create a genuine issue of material fact and preclude summary judgment. HCCSCD also contends that Ridley cannot obtain back pay for any time after she quit her job.

Each argument is analyzed below.

**II.     Analysis**

**A.     The Summary Judgment Standard**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B. HCCSCD's Objections to Ridley's Summary Judgment Evidence[3]

HCCSID objects to 43 separate parts of Ridley's and Kizzee's declarations. (Docket Entry No. 34). The objections are presented in a table listing the paragraph, statement, and basis for the objection. Many of the objections are unpersuasive; the others are to evidence that does not affect the outcome of this motion. For example, HCCSCD objects on hearsay grounds to Ridley's statement in paragraph 15 of her declaration that she heard "Schultz refer to me as a 'fucking black bitch female for a supervisor." A statement is hearsay to the extent it is offered to show the truth of the matter asserted. FED. R. EVID. 801(c). Ridley is clearly not offering this statement to prove that she is a "fucking black bitch female." Instead, the statement is offered to show that it was made. *See, e.g.*, *Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007) (unpublished). HCCSCD objects to other statements as "opinion," but there is no blanket rule against offering lay opinions. FED. R. EVID. 701; *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 168 (5th Cir. 2010) (citations omitted).

HCCSCD also objects that several statements attributed to HCCSCD employees and cited by Ridley as evidence of a causal link between Orendac's retaliatory animus and Ridley's failure to obtain the promotion are inadmissable hearsay. For example, Kizzee's declaration includes assertions about Orendac's evaluation of Ridley based on what other members of the promotion

---

[3] Ridley objects to HCCSCD's reliance on its position statement sent to the EEOC. Because Ridley's the record presents genuine issues of material fact that preclude summary judgment, even when taking the position statement into consideration, the objections are as moot.

committee said Orendac told them.  "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."  FED. R. EVID. 805.  "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  FED. R. EVID. 801(d)(2)(D); *Magiera v. City of Dallas*, 389 F. App'x 433, 439 (5th Cir. 2010) (per curiam) (unpublished).  In *Magiera*, a Title VII retaliation case, the plaintiff alleged that she had been taken off patrol duty after telling her supervisor, Lieutenant Bernard, not to touch her or call her "darling."  *Id.* at 436.  Resisting summary judgment on causation grounds, Magiera relied on the statement of Sergeant Kay White.  *Id.* at 438.  White testified that her supervisor, Lieutenant Woodbury, told her that Bernard told Woodbury that he had taken Magiera off the beat because she had complained about Bernard.  *Id.* at 438–39.  The court held that because each of the hearsay statements was made during the course of the speaker's employment as officers, it was admissible.  *Id.* at 439 (citing *Wilkerson v. Columbus Separate Sch. Dist.*, 985 F.2d 815, 818 & n. 11 (5th Cir. 1993) (holding that statements by school employees containing double hearsay were admissible under Federal Rule of Evidence 801(d)(2)(D) as admissions by agents of the school)).  Orendac's statements, which were evaluations of Ridley made and reported in the course of Orendac's employment, were reiterated by members of the committee to Kizzee.  The statements were "concerning a matter within the scope of the agency or employment," the decision whether to promote Ridley, "made during the existence of the relationship."  They are not inadmissible as hearsay.

**C.     Title VII Retaliation**

### 1. **The Legal Standard**

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because he has opposed an unlawful employment practice under this subchapter." 42 U.S.C. § 2000e-3(a). The elements of a prima facie showing of retaliation under Title VII are that the plaintiff: (1) engaged in an activity protected by Title VII; (2) was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action. *Id.* If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* The standard of proof on the causation element of a Title VII claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct. *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004). This standard allows a plaintiff to prevail if retaliation was one of several motives that caused her termination. *Smith v. Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010).

Before the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Fifth Circuit applied the same standard for adverse employment actions for discrimination and retaliation claims under Title VII. *See McCoy v. City of Shreveport*, 492 F.3d 551, 550 (5th Cir.2007). "[O]nly ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating" qualify as adverse employment actions that may be the basis for a discrimination claim. *Id.* at 559 (quoting *Green v. Adm'rs of Tulane Educ. Fund*,

284 F.3d 642, 657 (5th Cir. 2002)). In *Burlington*, the Supreme Court held that a broader set of actions could be the basis for a retaliation claim. The purpose of Title VII's retaliation prohibition is "preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the [Title VII's] basic guarantees." *Burlington*, 548 U.S. at 69. Thus, an adverse employment action for a retaliation claim is any action that a "reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotations omitted). The Court clarified, however, that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

HCCSCD does not challenge whether Ridley's complaints about Schultz and the subsequent discipline, or about the work Ridley received from Orendac after she was transferred, were protected activity. Nor does HCCSCD challenge whether the promotion decision was an adverse employment decision. HCCSCD challenges only the causation element, emphasizing that the individuals who made the promotion decision were not the subjects of Ridley's complaints or the alleged retaliators. Ridley invokes the "cat's paw" theory, which allows an employee to recover under certain circumstances even though the decisionmaker responsible for the adverse action did not act with illegal animus. The Supreme Court recently confirmed the validity of this theory in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011). *Staub* involved the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 3411(a), not Title VII. The Court noted that the statute is "very similar to Title VII." *Staub*, 131 S. Ct. at 1191. Both statutes prohibit adverse actions in which bias is "a motivating factor." *Id.* (comparing 38 U.S.C. § 4311(a) with 42 U.S.C. § 2000e-2(m)). The question in *Staub* was whether an employer could be liable when the employee

responsible for the termination relied on a supervisor's animus-driven performance evaluation. The Court held that "if a supervisor performs an act motivated by [illegal] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* at 1194 (emphasis in original; footnotes omitted). The presence of another basis for termination, such as an independent investigation by the person who made the decision, does not necessarily save the employer from liability. The Court explained that "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* at 1193.

### 2. Application

Ridley contends that Orendac[4] gave her a negative evaluation in retaliation for the complaints Ridley made. Ridley points specifically to Orendac's comments that if she continued to complain about her workplace treatment, she would be viewed as "inflexible." Ridley disputes the criticisms Orendac made in the evaluation and presents evidence that at least some of the events Orendac reported did not occur or did not occur as Orendac described them. The negative evaluation, Ridley argues, was relied on by the screening committee and caused her to lose the promotion.

Orendac admits that she discouraged Ridley from pressing her complaints about Schultz and told her that if she did so, she could be viewed as "inflexible" and unable to deal with workplace problems. Orendac asserts that her motives were benign; she was counseling Ridley to "empower" her. But there is also evidence that after Orendac made this statement, Ridley complained about Ordenac and was transferred as a result. There is also evidence that Ridley had complained to

---

[4] HCCSCD's motion for summary judgment refers to Kizzee. This appears to be a typographical error.

Orendac about the work she received under Orendac's supervision. Other evidence in the record about Orendac's negative evaluation of Ridley is conflicting. For example, there is a significant disagreement between Ridley and Orendac about Ridley's actions surrounding the media incident. There is also significant disagreement about whether Orendac's criticism of Ridley's work was accurate. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). Despite her assertion in her deposition testimony that she had "no power" to affect Ridley, the record also shows that Orendac knew Ridley wanted to be promoted and that Orendac was interviewed as part of the promotion decisionmaking process. HCCSCD does not contend that Orendac was unaware that her assessment would be used in that process. These facts could permit an inference that Orendac intended that her assessment of Ridley would prevent her from being promoted.

The next question is whether Ridley has produced sufficient evidence to raise a fact issue as to whether Orendac's complaint was a proximate cause of Ridley not receiving the promotion. She has. Kizzee, a member of the board that considered the promotions, provides sufficient evidence on this point. She testified that although the panel had 31 applicants, it spent most of its time discussing three or four, including Ridley. (Docket Entry No. 31, Ex. 3, ¶ 20). Kizzee testified that "the panel relied heavily on [Orendac's] view that [Ridley] did not complete her assignments and that she demonstrated a market lack of judgment regarding what became labeled as 'the media incident.'" (Docket Entry No. 31, Ex. 3). HCCSCD contends that other evidence shows that Orendac's assessment did not cause Ridley to lose the promotion. HCCSCD notes, for example, that Ridley's scores put her in the bottom half of the candidates. Even if her interview scores were part

14

of the reason that Ridley did not get the promotion, the Supreme Court recognized in *Staub* that "it is common for injuries to have multiple proximate causes." 131 S. Ct. at 1193 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004)). And the record shows that Ridley's score was affected by the evaluations her former supervisors, including Ordenac, provided. The record does not conclusively establish that Orendac's report was not a proximate cause of Ridley being passed over for the promotion.

### D.     Back Pay

HCCSCD seeks summary judgment that Ridley cannot obtain back pay. "'Back pay' commonly refers to the wages and other benefits that an employee would have earned if the unlawful event that affected the employee's job related compensation had not occurred." *Rutherford v. Harris Cnty., Tex.*, 197 F.3d 173, 191 (5th Cir. 1999) (quoting *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 n.8 (5th Cir. 1996)). In this promotion case, the measure of Ridley's back pay is the "the additional incremental wages and employment benefits that she would have received had she been promoted." *Id.* (citing *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1449 (9th Cir. 1990)). "Back pay is an equitable remedy that is within the sound discretion of the district court in Title VII cases, but the employee has a duty to avoid or minimize damages by finding substantially equivalent employment." *Manuel v. Tex. State Technical Coll.*, 294 F. App'x 852, 854 (5th Cir. 2008) (per curiam) (unpublished) (citing *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990)). HCCSCD argues that Ridley cannot receive back pay after she quit her job in July 2010 because she has not sought employment since then. Ridley responds that she diligently sought a promotion before her resignation, but no open positions were available. HCCSCD does not, however, appear to challenge Ridley's diligence while still an HCCSCD employee. Ridley points

to no evidence of diligence after resigning. She cannot seek postresignation back pay.

**III.    Conclusion**

HCCSCD's motion for summary judgment is granted in part and denied in part. The discrimination claim and the claim for punitive damages have been withdrawn. Genuine issues of material fact prevent summary judgment on Ridley's Title VII retaliation claim. Ridley cannot, however, seek back pay for the period after she resigned from HCCSCD.

SIGNED on April 19, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge